# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TYRIN SMITH, | ) |
| Petitioner, | ) ) ) |
| vs. | ) Case No. 18 C 1810 |
| JACQUELINE LASHBROOK, Warden, | ) ) ) |
| Respondent. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

An Illinois jury convicted Tyrin Smith of first-degree murder. A Cook County judge sentenced him to fifty years in prison. Having exhausted direct appeals and state collateral challenges, Smith now petitions for a writ of habeas corpus under 28 U.S.C. § 2254. The warden of the facility in which Smith is imprisoned, Jacqueline Lashbrook, has moved to dismiss the petition as untimely. For the reasons below, the Court grants Lashbrook's motion.

## Background

Tyrin Smith was convicted of killing Danny Dupree shortly after midnight on June 9, 2002 near the corner of Monroe and Kildare streets in Chicago. Dupree was socializing with friends—including DeCarlos Toro, Jay Arthur Mackey, Berklin Fowles, and Pierre Norris—near the street corner. According to trial testimony from Toro, Mackey, and Fowles, the men had congregated shortly before midnight to discuss a boxing match between Mike Tyson and Lennox Lewis that had taken place on the

evening of June 8.  They were situated close together with some in the group standing and others sitting on a railing that separated the sidewalk from the parking lot that occupied the street corner.

After 11:30 p.m., Chicago Police Officer Larry Neuman arrived at his nearby home, on the opposite corner of the Monroe and Kildare intersection.  No longer in uniform, Neuman went to survey the perimeter of his property.  According to Neuman, Mackey was an acquaintance and initiated a conversation with him, introducing Neuman to Mackey's brother Toro.  Neuman exchanged pleasantries with the men before returning to his property.

A short time later, a stranger approached the group.  According multiple witnesses, the man got out of a green Buick sedan that parked on the corner.  He approached the group, apparently walking past most of the men.  When he reached Norris, however, the man brandished a handgun and pointed it at Norris's head.  He then instructed the members of the group to place their money on the ground.  The men testified that they obliged.  The gunman then instructed Toro to take off the baseball cap that he was wearing and to collect the pile of cash.  Toro did so and handed the cap over.  The man then commanded the group to turn around, step over the railing, and move into the parking lot.  The group again complied.

As they stepped over the railing, the gunman began shooting.  According to Toro, Mackey, Fowles, and Neuman, there were two or three shots fired.  At least one struck Dupree.  Mackey, Fowles, and Norris ran, hiding behind a parked car in the lot or rushing away down the street.  Toro could not run because of a mobility-limiting disability.  He remained with Dupree.  According to all four witnesses, the gunman ran

2

back to the waiting car, which sped off. In the following moments, Toro testified that he sat with Dupree and told him to stay awake.

Neuman did not see the shooting, but he heard the shots and moved quickly. From his vantage point, Neuman saw an unknown man with a gun running toward a green Buick. He did not attempt to stop the man because he did not know what had happened. But Neuman said that he immediately called 911 from his cellular phone and moved to the scene. When Neuman arrived, Toro was still with Dupree. Fowles, Mackey, and Norris were also nearby. Neuman instructed them not to move Dupree.

A short time later uniformed officers and paramedics arrived. Dupree was transported to a hospital, where he was pronounced dead. Meanwhile, Toro, Mackey, Fowles, and Neuman were interviewed by detectives and gave statements about the incident.

There were few leads in the case for several weeks. Then, nearly a month later on July 6, Mackey was nearby the scene of the attack when he saw a man he recognized to be the shooter. Mackey immediately called one of the detectives who had interviewed him after the shooting and reported that he had seen the gunman, describing the car he had seen the man driving and providing its license plate number. The suspect was arrested soon thereafter.

The same evening, detectives brought Mackey in to view a lineup. He identified Tyrin Smith as the man who he saw shoot Danny Dupree. Fowles viewed a lineup the same evening, and he too identified Smith as the shooter. The next day, July 7, Neuman also viewed a lineup and identified Smith. Finally, Toro was brought in on July 8 and identified Smith in a lineup.

3

At trial, Toro, Mackey, Fowles, and Neuman each again identified Smith as the shooter. They also testified that the area in which the shooting occurred was well enough lit that they were confident in their identifications. The jury unanimously convicted Smith of first-degree murder. The trial judge sentenced him to fifty years' imprisonment. Smith appealed, arguing that there was insufficient evidence to support a finding of guilt beyond a reasonable doubt and that prosecutors had engaged in misconduct by, among other things, calling him a criminal during closing arguments and misstating the burden of proof. The Illinois Appellate Court affirmed the conviction. *See People v. Smith*, No. 1-07-0177 (Ill. App. Ct. Sept. 11, 2009). Smith failed to timely file a petition for leave to appeal to the Illinois Supreme Court—it was due by October 16, 2009—and when he submitted a request for leave to file late petition on September 30, 2010, the court denied his request. *See People v. Smith*, No. 12626 (Ill. 2010).

In May 2011, Smith filed a petition for post-conviction relief in state court. He claimed that he was denied effective assistance of counsel and that his arrest was constitutionally deficient. The state court rejected the petition at the second stage of review, and the Illinois Appellate Court affirmed. *See People v. Smith*, 2016 IL App (1st) 133565-U. Smith then asked for leave to file a successive post-conviction petition, which the trial court denied—a ruling that the Illinois Appellate Court affirmed. *See People v. Smith*, 2018 IL App (1st) 160232-U.

On March 12, 2018, Smith filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## Discussion

Under 28 U.S.C. § 2244(d)(1), a one-year limitations period applies to habeas

4

corpus petitions under section 2254. In this case, the limitations period began to run when "the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Smith's conviction became final on October 16, 2009, when the window for filing a timely petition for leave to appeal to the Illinois Supreme Court closed. *See Jones v. Hulick*, 449 F.3d 784, 787-88 (7th Cir. 2006).

Lashbrook argues that the year-long limitations period expired on October 18, 2010 because Smith did not to file a petition for state or federal postconviction relief during that time. She may be correct. The Court notes, however, that although the parties do not raise it, section 2244(d)(2) should also be addressed here. That provision tolls the one-year limitations period during the pendency of "a properly filed application for State post-conviction or other collateral review" of the conviction. 28 U.S.C. § 2244(d)(2). Section 2244(d)(2) could at least arguably support the tolling of the time bar during the pendency of Smith's request to file a late petition for leave to appeal. The Court need not decide this point, however, because even if the statutory period were tolled from September 30, 2010 when Smith filed the request with the Illinois Supreme Court until November 23, 2010 when that court denied the request, that would only have extended the deadline for filing the state post-conviction petition from October 18, 2010 to mid-January 2011. Smith did not file his state postconviction petition until May 2011.

Having established that Smith's petition is untimely, the Court must next assess whether he has made a case for avoiding the time bar. Construing his submissions broadly, Smith advances two theories. First, he points to evidence that he contends

supports a claim of actual innocence that would permit him to avoid the time bar under *Schlup v. Delo*, 513 U.S. 298 (1995). Second, he argues that he is entitled to equitable tolling under *Holland v. Florida*, 560 U.S. 631 (2010).

**A.    Actual innocence**

To establish actual innocence, a habeas corpus petitioner must show that in light of new evidence "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.

Smith's actual innocence claim is predicated on four affidavits. Specifically, in this and his previous petitions for post-conviction relief, Smith has offered affidavits from witnesses who he says exonerate him. The first two affidavits are from Elaine McGee Longmire and Stephanie Longmire and were offered in support of Smith's first state postconviction petition.[1] Both witnesses stated that they had watched the fight between Mike Tyson and Lennox Lewis with Smith on the evening of June 8, 2002 and that he had remained with them to watch a movie after the fight. They further attested that they gave Smith a ride home in the early morning hours of June 9.

The third affidavit—this one from Mark Smith—was offered in support of Smith's procedurally rejected second state post-conviction petition. Mark Smith attested that he had met Tyrin Smith in July 2013 at the Menard Correctional Center. After discussing the crime for which Tyrin had been convicted, Mark says he realized that he had actually been a witness to the shooting on the corner of Monroe and Kildare. Mark attested that he had been in the area in search of cannabis and that he had seen a

---

[1] The parties do not address whether these affidavits constitute "new evidence" of the sort that can support a claim of actual innocence. *See Schlup*, 513 U.S. at 316. Because it does not change the outcome, the Court assumes that they qualify.

6

longtime acquaintance named Turin Houston approach Dupree, Toro, Mackey, Fowles, and Norris. Mark Smith said that it was Houston, not Tyrin Smith, who fired the shot that killed Dupree.

The fourth affidavit, tendered for the first time as an attachment to the present petition, was from Roger Allen. Allen attested that he had been among the group socializing on the corner of Monroe and Kildare on the night Dupree was killed. He says he witnessed the shooting and that it was not Smith who pulled the trigger. In his affidavit, Allen went on to state that he and Mackey conspired to frame Smith for Dupree's murder as revenge for a perceived slight. According to Allen, Mackey called the police on July 6, 2002 at his suggestion. Allen said that he was present when police arrived and that he subsequently appeared in lineups with Smith. Afraid that he would be called to testify, Allen said he told police that he had not actually seen the crime, but he signed a statement saying that Smith had confessed to Allen that he (Smith) had killed Dupree. Allen further attested that he realized that what he had done was wrong when he came to the Menard Correctional Center to cut inmates' hair and saw Smith in shackles.

Assuming that all four affidavits are properly before the Court, they are insufficient to meet "the demanding standard for actual innocence." *Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016). Although the Seventh Circuit has "recognized high rates of error in eyewitness identifications of strangers," it has noted that "those findings have only limited application when multiple witnesses identify the same person." *Id.* In *Blackmon*, for instance, the Seventh Circuit rejected an actual innocence claim predicated on the testimony of two witnesses who submitted affidavits

7

eight years after a murder in which two other witnesses had identified the defendant as the shooter at trial. *Id.* at 1102. Noting that the long delay undermined the credibility of the later witnesses' testimony, the court concluded that "[t]his sort of balance between inculpatory and exculpatory witnesses is not enough to meet the demanding *Schlup* standard for actual innocence." *Id.* Here, as in *Blackmon*, multiple witnesses identified Smith as the shooter at and before trial. That additional witnesses now offer testimony, years after the events underlying Smith's conviction, directly or indirectly contradicting the four witnesses who identified him at trial is simply not enough to establish actual innocence under the governing standard.

Finally, Allen's statement that he and Mackey conspired to frame Smith is also insufficient to support actual innocence. Besides being less credible because of its long delay, *see id.*, the statement does not begin to explain why three witnesses in addition to Mackey would also have identified Smith as the shooter. Although it may be plausible to infer that the conspiracy Allen alleged may also have included Mackey's brother Toro and friend Fowles, it less plausible that Neuman, the police officer who lived across the street, was in on such a lie. In any event, the question here is not whether the petitioner's evidence creates a plausible inference of innocence; it is whether "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. The affidavits tendered by Smith do not carry him over this threshold.

**B.   Equitable tolling**

Smith also appears to argue for equitable tolling under *Holland v. Florida*, 560 U.S. 631 (2010). *Holland* allows a habeas corpus petitioner to avoid a time bar where

8

he can show that (1) he diligently pursued his rights and (2) an "extraordinary circumstance" prevented him from timely filing. *Id.* at 649. In *Holland*, for instance, the Supreme Court found that an attorney's abject failure to timely file a prisoner's habeas corpus petition despite numerous requests from the prisoner to do so, alongside the attorney's years-long failure to communicate with his client, constituted such extraordinary circumstances.

Here, in contrast, Smith contends only that he has not been negligent in pursuing his case. Even if he were able to satisfy *Holland*'s first requirement, Smith does not point to any evidence suggesting that he has faced the sort of extraordinary circumstances precluding timely filing that are required for equitable tolling. He thus cannot avoid the time bar.

## Conclusion

For the foregoing reasons, the Court grants respondent's motion to dismiss the petition for writ of habeas corpus [dkt. no. 14] and declines to issue a certificate of appealability because reasonable jurists would not differ over whether the petition is time-barred. The Clerk is directed to enter judgment dismissing petitioner's habeas corpus petition.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 25, 2019